## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**JESSIE J. SPAULDING, JR.,**

      **Plaintiff,**

**v.**                                                                 **Case No.: 3:19-cv-00016**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**[1]

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 10, 13).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Commissioner of the Social Security Administration, Andrew M. Saul, is substituted for former Commissioner, Nancy A. Berryhill, as Defendant in this action.

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

In March 2013, Plaintiff Jessie J. Spaulding, Jr., ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of August 3, 2012 due to "left ear hearing loss, right shoulder, both knees, 3 bulging disc[s] in neck, [and] PTSD." (Tr. at 402-09, 461). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 27). Claimant filed a request for an administrative hearing, which was held on December 2, 2014 before the Honorable David DeLaittre, Administrative Law Judge ("ALJ DeLaittre"). (Tr. at 59-85). By written decision dated January 23, 2015, ALJ DeLaittre found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 179-96). Claimant appealed the decision, and the Appeals Council remanded the matter due to deficiencies in ALJ DeLaittre's analysis of Claimant's ability to stoop. (Tr. at 198-99). On remand, the Honorable Jerry Meade, Administrative Law Judge (the "ALJ"), held a hearing on August 15, 2017 and a supplemental hearing on April 12, 2018. (Tr. at 86-122). By written decision dated July 11, 2018, the ALJ determined that Claimant was not disabled as defined in the Social Security Act. (Tr. at 24-55). The ALJ's decision became the final decision of the Commissioner on November 19, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-8).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing

Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Motion for Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 10, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 36 years old on his alleged onset date and 42 years old on the date of the ALJ's decision. (Tr. at 44). He completed high school, communicates in English, and previously worked as a laborer building bridges and as a coal miner. (Tr. at 460, 462, 463).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

3

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§

404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance benefits through June 30, 2018. (Tr. at 30, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 3, 2012, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: history of nondisplaced fracture of greater tuberosity and labral tear of the right shoulder, status-post repair; mild degenerative joint disease of the right AC joint; bilateral knee osteoarthritis, chondromalacia patella, and right meniscus tear, status-post arthroscopic tear; remote history of left tibia fracture; degenerative disc disease of the cervical spine with right radiculopathy; bilateral sensorineural hearing loss; mild right carpal tunnel syndrome; depression; anxiety; and posttraumatic stress disorder ("PTSD"). (*Id.*, Finding No. 3). The ALJ considered Claimant's balance impairment and obsessive-compulsive personality traits, but the ALJ found these impairments to be non-severe. (Tr. at 30-31).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 31-32, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can never crawl or climb ladders, ropes, and scaffolds. He can occasionally climb ramps and stairs. He can occasionally balance, stoop, kneel, and crouch. He can never reach overhead with the dominant right upper extremity. He can frequently reach in all other directions with the right upper extremity. He can frequently (but not repetitively) handle and finger with the right hand. The claimant must avoid concentrated exposure to extreme cold; vibrations; and hazards such as moving machinery and unprotected heights. He is limited to occupations that do not require frequent telephone communication or frequent verbal communication. The claimant can understand, remember, and carry out simple and detailed instructions. He can have occasional changes in the work setting. He can occasionally interact with the public. He can frequently

6

interact with co-workers and supervisors.

(Tr. at 32-44, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform his past relevant work. (Tr. at 44, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine Claimant's ability to engage in other substantial gainful activity. (Tr. at 44-45, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1975 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 44-45, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy; including, light-level work as a price marker or routing clerk and sedentary-level work as an inspector or table worker. (Tr. at 45, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 46, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant asserts a single challenge to the Commissioner's decision. He contends that the ALJ failed to give "good reasons" for rejecting the opinions of his treating psychiatrist, John Light, M.D. (ECF No. 10 at 4). In response, the Commissioner argues that the ALJ correctly analyzed Dr. Light's opinions based on 20 C.F.R. §§ 404.1527 and 416.927, and his analysis was supported by substantial evidence. (ECF No. 13).

## V.    <u>Relevant Evidence</u>

The undersigned reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenge is summarized as follows:

### *A. Claimant's Statements*

Claimant testified during his three administrative hearings. On December 2, 2014, Claimant stated that he used to be a social person, but he became withdrawn after seeing his friends killed in a work-related accident in the coal mine. (Tr. at 74-75). He testified that he sometimes did not want to get out of bed, leave the house, or be around anyone, particularly strangers. (*Id.*). He sometimes felt guilt over his friends' deaths, thinking that if he had "been there they'd be alive." (Tr. at 75). He testified that he was awoken by nightmares about their deaths approximately every two hours at night. (*Id.*). He stated that he went to church "every time the door's open," if he could, but it was "not really" helping. (*Id.*). Claimant testified that he did not want to be around people a lot, other than his wife, and he sometimes arose in the morning feeling like he "could just stab somebody right through the throat" regarding how his friends' deaths were handled. (Tr. at 76). He explained that the anger dissipated after he woke up, calmed down, and took his medicine. (*Id.*).

During his hearing on August 15, 2017, Claimant testified that he continued to have night terrors and frequently awoke from sleep. (Tr. at 102). He expressed that he also continued to have issues being around people. (Tr. at 103). He admitted going to church, but explained that he went with people who were familiar to him. (*Id.*). Claimant added that he had to take medication to be around other people, even his own family. (*Id.*). He stated that he had violent outbursts with his father and other family members, and he was a "nervous wreck" all of the time. (Tr. at 104-06).

Finally, during his hearing on April 12, 2018, Claimant stated that he still had nightmares and trouble sleeping, and had difficulty concentrating and remembering things. (Tr. at 115-16).

### B. Treatment Records

On July 17, 2013, Claimant saw his psychiatrist, John Light, M.D., who documented that Claimant's mental status examination was completely normal, including normal "psychiatric/neuro;" orientation to person, time, and place; attention span/concentration; language; fund of knowledge; judgment; remote and recent memory; mood/affect; lack of abnormal/psychotic thoughts; thought process; associations; and speech. (Tr. at 1191). Claimant stated, "I feel great today," and he told Dr. Light that Valium provided "day long anxiety control." (*Id.*).

During his next visit, on October 9, 2013, Claimant's attention span and concentration were abnormal, and he had an anxious mood/affect, but the rest of his mental status examination was unremarkable. (Tr. at 1192). Dr. Light renewed Claimant's prescription for Valium. (*Id.*). At his subsequent visit on March 26, 2014, Claimant complained to Dr. Light that he was really anxious because he did not take Valium for three weeks, and his ex-wife was preventing him from seeing his sons. (Tr. at 1207). However, Claimant's mental status examination was entirely normal during this visit and during his next visit on July 16, 2014. (Tr. at 1206, 1207). He was continued on Valium at both appointments. (*Id.*).

On October 21, 2014, Dr. Light recorded that Claimant's attention span and concentration were abnormal, and he again had an anxious mood/affect, but the rest of Claimant's mental status examination was normal. (Tr. at 1311). Claimant reported having issues regarding "multiple deaths." (*Id.*). Dr. Light increased Claimant's prescription for

Valium from once to twice per day. (*Id.*). On January 13, 2015, Dr. Light noted Claimant's anxious mood/affect, but documented that all of Claimant's other mental status examination findings were normal. (Tr. at 1406). Claimant complained that he had trouble seeing his son, but he reported that Valium caused "significant improvement" in his anxiety. (*Id.*). He was continued on Valium and was also prescribed gabapentin. (*Id.*).

On May 6, 2015, Dr. Light found Claimant's attention span and concentration and mood/affect to be abnormal, but Claimant did not have any other abnormal mental status examination findings. (Tr. at 1405). Claimant was having issues with his ex-wife and nightmares about his friends dying in the mine. (Tr. at 1405). However, Dr. Light noted that Valium was effective in treating Claimant's anxiety, and Claimant had a great response to gabapentin. (*Id.*). Dr. Light prescribed Valium, gabapentin, Zoloft, and Minipress. (*Id.*).

On August 25, 2015, Claimant's mental status examination was entirely normal. (Tr. at 1404). Dr. Light renewed Claimant's prescriptions for Valium and gabapentin, increased his prescription for Zoloft, and discontinued Minipress. (Tr. at 1404). Claimant's mental status examination was normal again on November 17, 2015, and he was continued on medications. (Tr. at 1400). Dr. Light noted during that visit that Claimant had mood symptoms, but he continued to report a great response to Valium. (*Id.*). On April 6 and August 23, 2016, although Claimant reported some personal issues, his mental status examinations did not reveal any abnormalities. (Tr. at 1401, 1403). He was continued on medications. (*Id.*).

### C. Evaluations and Opinions

On June 19, 2013, psychologist Angel Glick, M.A., evaluated Claimant for the West Virginia Disability Determination Section. (Tr. at 1171). Claimant told Ms. Glick that he

10

was applying for disability benefits due to PTSD and OCD. (*Id.*). He related that he was constantly putting "things in order." He reported witnessing a roof fall while working at a coal mine, which crushed two of his friends. (*Id.*). Claimant described being present when their bodies were carried out, remarking that one of which was "in pieces." (*Id.*). He stated that his mental symptoms began years ago, but they worsened after he injured his shoulder in a workplace accident in 2007. (*Id.*). Ms. Glick found that Claimant's mood was depressed; his affect was restricted; his recent memory was moderately deficient based on the four word test; and his concentration was moderately deficient based on the serial 3's test. (Tr. at 1174-75). However, Claimant's interpersonal behavior was friendly and cooperative throughout the interview; he was oriented in all spheres; his thoughts were organized, relevant, and logically connected; he had no psychotic thought patterns or hallucinations; his judgment was average; his immediate and remote memory, persistence, and pace were unimpaired; and his psychomotor activity was normal. (Tr. at 1174-75). Ms. Glick diagnosed Claimant with PTSD and Major Depressive Disorder, single episode, with obsessive-compulsive personality traits. (Tr. at 1175). Ms. Glick found that Claimant did not meet the criteria for a specific Obsessive-Compulsive Disorder diagnosis. (Tr. at 1176).

On July 2, 2013, state agency psychologist, Karl G. Hursey, Ph.D., assessed Claimant's mental RFC based upon a review of Claimant's records. Dr. Hursey found that Claimant did not have any understanding and memory limitations. (Tr. at 132). In terms of concentration and persistence, Dr. Hursey concluded that Claimant was moderately limited in carrying out detailed instructions and maintaining concentration for extended periods, but he assessed that Claimant could at least maintain concentration for simple, familiar, routine, repetitive tasks over a typical work period. (Tr. at 133). As a basis for his

assessment, Dr. Hursey explained that Claimant showed some severe mental/emotional impairments that produced mild-to-moderate functional limitations, but that, based on the evidence, Claimant retained the ability to carry out simple, routine tasks within the scope of the RFC assessment. (*Id*.). Timothy Saar, Ph.D, affirmed this mental RFC assessment on October 28, 2013. (Tr. at 160-61).

On November 18, 2014, Dr. Light likewise completed an RFC assessment. Dr. Light noted that he treated Claimant since May 17, 2013 and saw him approximately four times per year. (Tr. at 1312, 1317). He listed Claimant's diagnosis as Generalized Anxiety Disorder and opined that Claimant's prognosis was "guarded to poor." (Tr. at 1312). In terms of clinical findings and objective signs, Dr. Light stated that Claimant appeared anxious and sweaty, had poor concentration, was irritable at times, and had impaired memory. (*Id*.). He stated that Claimant was on Valium with minimal improvement, "according to Claimant." (*Id*.). Dr. Light assessed that Claimant's pain or symptoms were severe enough to frequently interfere with his attention and concentration in a typical workday, and Dr. Light found that Claimant was incapable of even low stress jobs. (Tr. at 1313). In support, he stated that Claimant could barely talk to Dr. Light, his psychiatrist of two years, for 30 minutes. (*Id*.). Dr. Light adjudged that Claimant's ability to work was affected by the fact that he was "poorly able" to interact with his peers, the public, or his boss on a work site due to his anxiety level. (Tr. at 1317). He concluded that, in his opinion, Claimant could not work a full-time job. (*Id*.).

On November 18, 2015, Dr. Light wrote a letter stating that he treated Claimant for the past three years for severe generalized anxiety disorder and equally severe PTSD. (Tr. at 1397). Dr. Light pronounced that Claimant was compliant with taking his medications and attending his appointments with Dr. Light, but he nonetheless had a "very minimal

response to the multitude of different medication trials." (*Id*.). Dr. Light provided his clinical opinion that Claimant could not work due to his anxiety and PTSD symptoms. (*Id*.). Also, Dr. Light stated his belief that, if Claimant returned to work, it would exacerbate Claimant's "already poorly-controlled anxiety and PTSD symptoms." (*Id*.).

On October 18, 2016, Dr. Light completed a Disability/Incapacity Medical Assessment form. (Tr. at 1408). He listed Claimant's diagnoses as PTSD, Generalized Anxiety Disorder, and Major Depressive Disorder. (*Id*.). Dr. Light opined that Claimant was "still too anxious/depressed to work." (*Id*.). However, he found that Claimant was capable of caring for children under the age of six. (*Id*.).

### D. Evidence that the ALJ Rejected Under Five-Day Rule[2]

Dr. Light provided an additional mental assessment dated April 8, 2018. (Tr. at 57-58). Claimant's diagnoses remained PTSD, Generalized Anxiety Disorder, and Major Depressive Disorder. (Tr. at 57). Dr. Light opined that Claimant had moderate limitation in following work rules and using judgment; marked limitation in functioning independently; moderate-to-marked limitations in maintaining attention/concentration and understanding, remembering, and carrying out simple and detailed job instructions; and extreme limitations in terms of dealing with co-workers or the public; interacting with supervisors; understanding, remembering, and carrying out complex job instructions; and especially in dealing with work stresses. (*Id*.). In support, Dr. Light stated that Claimant had severe anxiety, PTSD, depression, and chronic pain that affected his ability to function at home and in a work environment. (*Id*.). Dr. Light further found that Claimant was markedly limited in maintaining his personal appearance and

---

[2] As stated in the decision, the ALJ did not consider this evidence on the basis that it was submitted less than five days before the supplemental hearing and the requirements of 20 CFR §§ 404.935(b), 416.1435(b) were not met. (Tr. at 27).

13

extremely limited in behaving in an emotionally stable manner, relating predictably in social situations, and completing a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 58).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is

supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   Discussion

Claimant asserts that the ALJ did not correctly analyze the opinions of his treating psychiatrist, Dr. Light. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability.[3] *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

---

[3] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's applications were filed in 2013. Thus, the undersigned applied the law in effect at that time. (Tr. at 42-44).

substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[4] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.*, 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues

---

[4] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ noted Dr. Light's opinions that Claimant's impairments frequently interfered with the attention and concentration needed to perform even simple tasks, that Claimant could not tolerate even low stress jobs, that Claimant suffered from too much anxiety and PTSD to be gainfully employed, and that work would exacerbate

Claimant's poorly controlled anxiety and PTSD. (Tr. at 41-42). The ALJ determined under 20 C.F.R. §§ 404.1527(c), 416.927(c) that the opinions were not entitled to controlling weight because they were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with the other substantial evidence in the record. (Tr. at 42). Therefore, the ALJ analyzed the opinions in accordance with the six factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c), ultimately determining that Dr. Light's medical opinions were entitled to little weight. (Tr. at 42-43). The ALJ further noted Dr. Light's statements that Claimant could not work, but the ALJ cited that such statements were not medical opinions subject to the six-factor analysis because they were opinions on an issue reserved to the Commissioner and administrative findings that were dispositive of the case. (Tr. at 43-44). Nevertheless, the ALJ considered Dr. Light's disabling opinions, but gave them little weight. (Tr. at 44). A detailed analysis of the ALJ's consideration of Dr. Light's opinions and statements is as follows:

### A. Medical Opinions

Claimant does not articulate any challenge to the ALJ's decision not to give Dr. Light's opinions controlling weight. (ECF No. 10). Rather, Claimant contends that "the ALJ's analysis under the regulatory factors was not supported by substantial evidence." (*Id.* at 7-12). Therefore, the undersigned considers below the ALJ's analysis of the six factors that guided his consideration of Dr. Light's opinions.

### 1. Length of Treatment Relationship and Frequency of Examination

Regarding the first regulatory factor, the ALJ cited that Dr. Light treated Claimant since May 2013 at the frequency of approximately four times per year. (Tr. at 42). The ALJ noted that, although Dr. Light stated in a medical assessment dated October 18, 2016

that he saw Claimant earlier that day, "there [was] no evidence of record documenting additional visits with Dr. Light since then." (*Id.*). Claimant contends that the ALJ erroneously questioned whether Dr. Light continued to treat Claimant after October 2016 because Claimant "testified at his August 2017 hearing that he continued to treat with Dr. Light" and Dr. Light submitted an April 2018 RFC assessment, stating that he continued to treat Claimant three-to-four times per year. (ECF No. 10 at 7-8).

Addressing Claimant's first contention, Claimant's August 2017 testimony did not contradict the ALJ's finding that there was no documentation in the record of additional visits with Dr. Light after October 2016.  Claimant stated during his August 2017 hearing:

> I've got severe post-traumatic stress syndrome. My psychologist, Michael Light, Dr. Michael J. Light, he should be in all this information, I've got severe post-traumatic stress syndrome, severe anxiety. I was diagnosed as a kid with ADHD and I know none of that's got any better as far as that goes.

(Tr. at 104-05).

To the extent that Claimant's above testimony referred to Dr. Light as his present medical provider, the fact remained that there were no treatments notes or records of any kind documenting additional visits with Dr. Light after October 2016. Furthermore, while the April 2018 RFC assessment completed by Dr. Light referenced additional treatment, that assessment was rejected by the ALJ in accordance with 20 CFR §§ 404.935, 416.1435. (Tr. at 27-28). An ALJ does not have to consider evidence submitted less than five days prior to a claimant's administrative hearing, unless the ALJ determines that the claimant missed the deadline due to one or more of the circumstances provided in 20 CFR §§ 404.935(b), 416.1435(b). Claimant does not argue that any such circumstances existed in his case. (ECF No. 10 at 7-8).  Rather, he asserts that the ALJ should have considered the RFC assessment simply because it was submitted to the Agency before the ALJ issued his

decision. (*Id.*). Under clear regulatory law, the ALJ appropriately rejected the late-filed evidence. *See, e.g., Midkiff v. Berryhill*, No. 2:18-CV-00338, 2018 WL 8620562, at *11 (S.D.W. Va. Dec. 10, 2018), *report and recommendation adopted*, 2019 WL 1258845 (S.D.W. Va. Mar. 19, 2019) (discussing the application of the Five-Day Rule). As such, there was no documentation in the record that Dr. Light treated Claimant after October 2016, and the ALJ appropriately analyzed the first regulatory factor.

### 2. Nature and Extent of Treatment Relationship

Claimant does not challenge the ALJ's analysis of the second regulatory factor, stating that the "ALJ appropriately acknowledged that Dr. Light's treatment relationship "consisted of counseling sessions and prescription refills." (ECF No. 10 at 8). Therefore, no analysis of this factor is necessary.

### 3. Supportability

In terms of the third regulatory factor, the ALJ confirmed Dr. Light's diagnoses of PTSD, generalized anxiety disorder, and major depression. The ALJ also noted that Dr. Light summarized Claimant's symptoms, such as uncontrolled worry, and listed Claimant's medications. (Tr. at 42.). Claimant argues that, although the ALJ mentioned Dr. Light's Claimant's diagnoses, symptoms, and prescriptions, "the ALJ's analysis is completely silent on Dr. Light's explanations for his medical opinions, which the regulations provide entitle these opinions to more weight." (ECF No. 10 at 8.). Claimant contends that "Dr. Light provided several explanations linked to objective and longitudinal evidence to support his opinions that [Claimant] had functional limitations that would preclude his ability to work. (*Id.*). Specifically, Claimant cites Dr. Light's statements that Claimant experienced minimal improvement despite medications; Claimant appeared anxious and sweaty, had poor concentration and decreased memory,

and was irritable at times; that Claimant's symptoms were severe enough to frequently interfere with his attention and concentration; Claimant was incapable of even low stress jobs because he could barely even tolerate talking to Dr. Light for 30 mins; and that returning to employment would exacerbate Claimant's poorly-controlled anxiety and PTSD. (*Id.* at 8-9).

The ALJ explicitly noted in the decision most of Dr. Light's foregoing findings. (Tr. at 41-42). An ALJ is not obligated to comment on every piece of evidence submitted; rather, the ALJ's decision is read as a whole to ascertain the ALJ's reasoning and analysis. *See, e.g., Smith v. Colvin*, No. 2:14-CV-00084, 2015 WL 6082328, at *15-16 (N.D.W. Va. Sept. 24, 2015), *report and recommendation adopted sub nom. Smith v. Comm'r of Soc. Sec.*, 2015 WL 6126835 (N.D.W. Va. Oct. 16, 2015). In this case, the decision demonstrates that the ALJ considered the relevant evidence, which reflected on the supportability of Dr. Light's opinions.

### 4. Consistency

Regarding the fourth factor, the ALJ found the Dr. Light's opinions were inconsistent with the record as a whole, even with his own treatment notes. (Tr. at 42). By way of example, the ALJ emphasized that Dr. Light authored the November 18, 2015 opinion, finding Claimant disabled, a mere one day after recording Claimant's normal mental status examination. The ALJ added that Claimant had normal mental status examinations during his subsequent April and August 2016 appointments. (*Id.*). Claimant argues that the ALJ ignored the statements in the same treatment notes that were consistent with Dr. Light's opinions, which Claimant states were Dr. Light's notations that Claimant's mood symptoms and contentious relationships were ongoing. (ECF No. 10 at 9). In support of his challenge, Claimant relies upon *Testamark v. Berryhill*, 736 F. App'x

395, 398-99 (4th Cir. 2018), an unpublished opinion in which the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") remanded a case, because the ALJ did not appropriately analyze treating source opinions. (*Id*.). According to Claimant, like the ALJ in *Testamark*, the ALJ in this case did not explain how "isolated" normal mental examination findings were inconsistent with Dr. Light's opinions. (*Id*. at 10).

Contrary to Claimant's assertion, the ALJ clearly discussed significant evidence that contradicted Dr. Light's extreme opinions. Moreover, Claimant's normal mental status examinations were far from "isolated" occurrences; to the contrary, they comprised the majority of Claimant's psychological records. The ALJ pointed to numerous mental status examination findings recorded between 2013 and 2016, which confirmed Claimant's normal attention span and concentration. (Tr. at 39). The ALJ also discussed the results of Claimant's June 2013 consultative examination, noting that Claimant interacted well with the examiner and, although he displayed moderately deficient recent memory and concentration, his judgment, immediate and remote memory, and ability to stay on task were normal. (*Id*.). The ALJ further noted the opinions of the state agency psychologists, who concluded in July and October 2013 that Claimant could maintain concentration for simple, routine, repetitive tasks over a typical work period. (Tr. at 41).

The ALJ's above analysis regarding the inconsistency between Dr. Light's opinions and the evidence of record is supported by substantial evidence. In July 2013, Dr. Light recorded Claimant's normal mental status examination. (Tr. at 1191). Claimant told Dr. Light that he felt "great" and that Valium provided "day long anxiety control." (*Id*.). At subsequent visits through April 2016, while Claimant had a few instances of abnormal attention span/concentration and anxious mood/affect, his mental status examinations continued to be vastly normal. (Tr. at 1192, 1206, 1207, 1311, 1400, 1401, 1404, 1405,

1406). Claimant presented subjective complaints at times, complaining of issues with his ex-wife regarding custody of his sons and nightmares over the deaths of his friends. (Tr. at 1311, 1401, 1405, 1406). However, Claimant clearly expressed throughout the record that Valium effectively treated his anxiety. (Tr. at 1191, 1400, 1405, 1406). Dr. Light also noted on May 6, 2015 that Claimant had a "great response" to gabapentin. (Tr. at 1405).

Subsequently, on November 17, 2015, Dr. Light recorded that every single aspect of Claimant's mental status examination was normal, including normal psychiatric/neuro; orientation to person, time, and place; attention span/concentration; language; fund of knowledge; judgment; remote and recent memory; mood/affect; lack of abnormal/psychotic thoughts; thought process; associations; and speech. (Tr. at 1400). Claimant was on Valium, gabapentin, and Zoloft. (*Id.*). He expressed mood symptoms, but continued to report a "great response" to Valium. (*Id.*).

Notwithstanding these normal findings, Dr. Light provided an opinion the very next day, which stated that Claimant had very minimal response to the multitude of different medication trials, despite his compliance with taking medications and attending appointments. (Tr. at 1397). Dr. Light opined that Claimant could not work due to anxiety and PTSD and returning to work would exacerbate Claimant's "already poorly-controlled anxiety and PTSD symptoms." (*Id.*).

Thereafter, in April and August 2016, Claimant complained of some personal stressors, but had entirely normal mental status examinations. (Tr. at 1401, 1403). Nonetheless, without any additional documented visits, Dr. Light authored an opinion in October 2016 that was similar to his previous letter, stating that Claimant was "still too anxious/depressed to work." (Tr. at 1408).

Therefore, the ALJ very appropriately concluded that Dr. Light's opinions were

23

incongruent with the record. In addition, Claimant's citation to *Testamark* is misplaced. In that case, the Fourth Circuit identified three deficiencies in the ALJ's analysis of the treating source opinions. First, the ALJ found the treater's RFC opinion to be inconsistent with the evidence or record, but the ALJ relied only on treatment notes predating the alleged onset date to support that conclusion. *Testamark*, 736 F. App'x at 398. The ALJ did not discuss or cite to any relevant post-onset evidence that explained her analysis of the treating source opinions. *Id.* Second, the ALJ seized on "sparse observations from dated treatment notes," while overlooking the broader import of the record, which showed a steady decline in the claimant's mental health, culminating in hospitalization and increasingly aggressive clinical treatment. *Id.* at 399. Third, "the ALJ did not discuss the factors under § 404.1527(c) and § 416.927(c) or explain how those factors supported her decision to accord the opinions of [the claimant's treating providers] limited weight." *Id.*

Conversely, in the instant matter, the ALJ discussed relevant evidence from the appropriate time period, which was properly representative of the medical record. Claimant's record did not demonstrate any steady decline in mental health, hospitalization, or increasingly aggressive clinical treatment that was ignored by the ALJ in favor of selective pieces of dated treatment notes. Moreover, the ALJ explicitly documented his consideration of each regulatory factor. In sum, *Testamark* is readily distinguishable from the facts here, and the ALJ appropriately considered the consistency of Dr. Light's opinions with the record as a whole.

### 5. Specialization

In terms of the fifth factor, the ALJ stated that Dr. Light is a psychiatrist, and his opinions as to Claimant's physical RFC were entitled to less weight than if he specialized

24

in orthopedics, neurology, or internal medicine. (Tr. at 43). Claimant argues that the ALJ's evaluation of this factor is "especially suspect." (ECF No. 10 at 10). However, the ALJ correctly identified that Dr. Light is a psychiatrist, and that the ALJ must give more weight to the opinion of a specialist about medical issues related to his or area of specialty. (Tr. at 43). Dr. Light undoubtedly provided opinions within his specialty of mental health. Yet, as the ALJ aptly recognized, Dr. Light also rendered opinions about Claimant's physical abilities, such as how far Claimant could walk and how long he could sit and stand. (Tr. at 1314). The ALJ appropriately concluded that Dr. Light's opinions regarding Claimant's physical limitations were entitled to less weight than if Dr. Light were a specialist in orthopedics, internal medicine, or neurology. (Tr. at 43). Therefore, the ALJ's consideration of this factor was supported by substantial evidence.

### 6. Other Factors

Finally, the ALJ noted that there was no evidence that Dr. Light was familiar with the Social Security disability programs and their evidentiary requirements, nor was there any indication that Dr. Light was familiar with the other medical evidence of record when he issued his opinion. (Tr. at 43). Claimant suggests that the ALJ should have embarked on a fact-finding endeavor to determine whether Dr. Light was familiar with the Social Security disability programs, their evidentiary requirements, and the other medical evidence of record, given that the Agency possessed his direct contact information. (ECF No. 10 at 11). Not surprisingly, Claimant does not cite to any authority to support such a proposition.

An "ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d

1168, 1173 (4th Cir. 1986). However, the "duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). Claimant does not identify any ambiguity in the record or evidentiary gaps that would have required the ALJ to contact Dr. Light for further information.

Claimant additionally states that "the ALJ did not indicate what evidence in the record that had not been produced or reviewed by Dr. Light would have contradicted Dr. Light's opinions and/or supported the ALJ's lay opinion about [Claimant's] mental limitations." (ECF No. 10 at 11). As previously discussed, the ALJ very clearly identified the evidence that was inconsistent with Dr. Light's opinions, particularly Dr. Light's own treatment notes. Therefore, Claimant's assertion is plainly incorrect.

For all of the reasons stated above, the undersigned **FINDS** that the ALJ's analysis of Dr. Light's medical opinions is supported by substantial evidence.

### B. Issues Reserved to the Commissioner

Claimant cites that the ALJ gave little weight to Dr. Light's opinions that he could not work, in part, because Dr. Light did not express Claimant's functioning in terms of specific limitations. (ECF No. 10 at 11). Claimant contends that such reasoning is "obviously false" because, according to Claimant, Dr. Light provided many supporting statements and functional limitations in support of his assessments. (*Id.*).

In assessing a claimant's RFC, the ALJ performs "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-

26

related activities." SSR 96-8p, 1996 WL 374184, at *3. The functions that the ALJ must assess include the claimant's mental abilities to understand, remember, and carry out instructions and respond appropriately to supervision, coworkers, and work pressures in a work setting. 20 CFR §§ 404.1545(c), 416.945(c). Although Dr. Light made statements that Claimant had problems concentrating, tolerating stress, and interacting with others that precluded him from working, all of which the ALJ considered in assessing Claimant's paragraph B criteria and RFC, Dr. Light did not timely provide any specific mental functional limitations regarding the frequency and extent to which Claimant could perform work-related tasks and interact with others in a work setting. (Tr. at 1313, 1317, 1397, 1408). Therefore, the ALJ's reasoning is supported by substantial evidence. Furthermore, the ALJ found that Dr. Light's statements that Claimant was disabled were inconsistent with the objective, which, for the reasons discussed above, was a valid reason to assign little weight to the opinion.

In conclusion, the undersigned **FINDS** that the ALJ's analysis of Dr. Light's statements that Claimant could not perform substantial gainful activity is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  September 18, 2019

Cheryl A. Eifert
United States Magistrate Judge

28